# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| ERIC M. BACOLOD, | No.  53368-5-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| WASHINGTON STATE DEPARTMENT OF CORRECTIONS, | |
| Respondent. | |

SUTTON, A.C.J. — This appeal arises from inmate Eric M. Bacolod's Public Records Act (PRA)[1] requests to the Department of Corrections (DOC) for alleged PRA violations related to three separate requests.  Bacolod appeals the superior court's dismissal of his PRA claims, arguing that DOC violated the PRA when it (1) did not allow him to personally inspect electronic documents at the prison where he was incarcerated, (2) failed to conduct a reasonable search for a list of all inmates who downloaded songs from the album "Isis Makes a Porn" from the JPay, Inc. messaging system, during the time period of January 1, 2010, to the date of his request, and (3) failed to disclose or produce records in response to his request for every JPay message that had been rejected as sexually explicit by DOC and the corresponding mail rejection notice for a seven year period.  Bacolod also objects for the first time on appeal to DOC's cost bill.  Bacolod requests an award of appellate attorney fees.

---

[1] Ch. 42.56 RCW.

The DOC argues that it did not violate the PRA because (1) it provided Bacolod with physical copies of the documents he wanted to review electronically and it does not have a duty to allow him to personally inspect the records at the prison where he is incarcerated, (2) it is not obligated to provide records that do not exist, and (3) Bacolod's request for sexually explicit JPay messages did not seek identifiable public records. Regarding its cost bill, the DOC argues that Bacolod has waived any objection because he did not object below or file a motion to reconsider the costs. DOC further argues that if Bacolod does not prevail on appeal, he is not entitled to an award of appellate attorney fees and costs.

We hold that DOC did not violate the PRA, reject Bacolod's untimely challenge to DOC's cost bill, deny his request for appellate fees and costs, and affirm the superior court's dismissal of his PRA claims.

FACTS

I. BACKGROUND FACTS

The DOC's public records disclosure process is outlined in chapter 137-08-WAC. WAC 137-08-090(1) states that

> [a]ll requests for the disclosure of a public record, other than requests by incarcerated individuals for inspection of their health record or central file must be submitted in writing directly to the Department of Corrections Public Records Officer at P.O. Box 41118, Olympia, WA 98504 or via email at publicdisclosureunit@doc1.wa.gov identifying the record(s) sought with reasonable certainty.

This requirement is also outlined in DOC's Policy 280.510 Public Disclosure of Records. The term "central file" is a term that is used by the DOC "to refer to a physical file of documents with records related to an offender's incarceration." Clerk's Papers (CP) at 106-07. For individuals

2

who are currently incarcerated, their central files are maintained at the prison where they are housed.

## II. BACOLOD'S PRA REQUESTS

### A. PRU – 47690: ALL ELECTRONIC FILES ABOUT BACOLOD

On June 20, 2017, the DOC received a request from Bacolod that sought

> [t]he entire and any and all electronic files of myself (Eric Bacolod #760310) that has been and is currently maintained by The Washington State Department of Corrections (i.e. all information about me (Eric Bacolod #760310) found in OBITS; OMNI; LIBERTY; ON-BASE; and any other electronic file, format, or database).

CP at 128. This records request was assigned DOC tracking number PRU-47690.

After timely acknowledging Bacolod's records request, the DOC made records available to Bacolod. Bacolod refused to pay for the records because he insisted that he should be allowed to personally inspect the electronic version of the records. The DOC informed Bacolod that it could not facilitate electronic inspection because he was incarcerated and the records requested were not contained in his central file or medical file. After receiving no further correspondence from Bacolod on this request, the DOC administratively closed the records request for nonpayment.

The DOC's handling of this records request was consistent with its policy regarding inspection of electronic records. The DOC's process that allows inmates to inspect only physical copies of their central and medical files is intended to allow the DOC to respond to public records requests without interfering with its main function of supervising inmates and individuals on community custody. To allow review of any electronic file or other files that inmates may want to inspect would not allow the DOC to carry out its necessary functions. Additionally, allowing

offenders direct access to electronic systems would violate the DOC's information technology policy as well as the State's information technology policy. Offenders are not given access to the internet and their contact with the outside world is carefully monitored because of concerns that inmates will attempt to contact victims or engage in illicit activity. Inmates' use of portable storage devices is also carefully monitored to reduce the risks to safety and security created by offenders accessing such technology. The DOC's public records procedures promote important security interests.

Despite the restrictions that are in place, the DOC has dealt with multiple situations in which offenders have used portable storage devices to attempt to compromise DOC computers. Such circumstances include a situation in 2018 where inmates were discovered with portable storage devices that contained hacking software and computer code writing programs that gave them the ability to defeat computer security protocols and download unauthorized media to JPay media players.

B. PRU – 48397: LIST OF INMATES WHO DOWNLOADED "ISIS MAKES A PORN"

The DOC contracts with a private vendor, JPay, Inc., to provide services to offenders, including e-messaging, video visitation, and music downloads. Under the contract, JPay owns the recording media and that term is defined as the data gathered as a result of JPay's services. JPay owns all of the servers on which the data is stored. When the DOC has a problem with a JPay kiosk, the DOC contacts JPay and JPay sends a technician to the facility. Additionally, when an offender or family member has a problem with the JPay system, they are referred to JPay.

The DOC receives a commission from JPay. This commission is set by the contract. Any commission paid to the DOC is paid into the Offender Betterment Fund. This fund provides

support for offender activities. The DOC receives a monthly report of the commissions paid by JPay, but this report does not contain the names of individual songs or albums that any inmate downloads. Because the DOC's commission does not vary based on the name of the song or album, the DOC does not have any use for information about the specific songs downloaded by inmates.

On July 27, 2017, the DOC received a public records request from Bacolod that sought "[a] list of any and all offender's [sic] who have downloaded any individual songs of or the entire album titled, 'Isis Makes a Porn,' by Stephanie Love, from the WA State JPay system, during the time periods of January 1, 2010, to the present time and date of this request." CP at 140. This request was assigned DOC tracking number PRU-48397 and was assigned to Public Records Specialist Mara Rivera.

The DOC acknowledged Bacolod's records request within five days and sought clarification about whether Bacolod was seeking records from a specific facility. Approximately one month later, the DOC received a letter from Bacolod indicating that he would like any and all records from any DOC facility. The DOC acknowledged Bacolod's clarification of his request and began searching for responsive records.

On September 18, 2017, Rivera sent a routing slip to Shawn Coleman in Business Services at DOC headquarters asking staff to search for responsive records. On October 23, Rivera resent the routing slip to Julyette Prothero in Business Services because Shawn Coleman had been out on leave for a period of time. On that same date, Prothero forwarded the records request to Fiscal Services Analyst Karen Southwell also in Business Services. Southwell responded that Business Services would not have responsive records and after receiving a follow-up response from

Prothero, Southwell clarified that the request should be run through DOC's investigations unit. Prothero forwarded Southwell's response to Rivera on the same day.

On October 25, Rivera sent a response to Prothero and stated that she had been notified that the DOC's Trust Accounting Manager Dan Lewis would be knowledgeable of the records being requested and that Lewis had provided records for requests similar to this in the past. Rivera asked that Prothero check with Lewis.

On October 30, Rivera sent a letter to Bacolod indicating that additional time was needed to respond to his records request and that further response would be provided by December 13, 2017.

On November 1, Lewis responded to Prothero and copied Rivera. Lewis stated that he did not have access to the requested records. Lewis stated that he receives a monthly report of commissions paid by JPay and attached an example of what he receives to his response.

On November 6, Rivera sent a follow-up email asking Prothero and Lewis to confirm that there was no one else who would be able to provide the requested records. Lewis responded on the same day and said that he did not know whether investigations staff at DOC headquarters might be able to see the level of detail that was being requested and recommended that Rivera forward the request to Keith DeFlitch.[2] That same day, Rivera sent an email to DeFlitch asking him whether he was able to provide responsive records. DeFlitch responded that he did not have access to the title of songs that offenders purchase and that he can only see the amount that they spend on songs.

---

[2] Keith DeFlitch is employed by the DOC and the DOC's primary contact with JPay.

On December 13, Rivera sent Bacolod a letter indicating that the DOC had searched and had not found any responsive records.

At the merits hearing, Bacolod was unable to produce any admissible evidence that the JPay system ever had an album entitled "Isis Makes a Porn." Bacolod attempted to access the album on his JPay player[3] and was unable to do so. Bacolod's belief in the existence of this album was based on rumors that were "flying around" the inmate community. CP at 465. The superior court found that "[the DOC] did not have a record that contained the information requested by Mr. Bacolod." CP at 395.

C. PRU – 49030: EVERY SINGLE JPAY MESSAGE THAT WAS REJECTED BY THE DOC AS SEXUALLY EXPLICIT SINCE 2010 AND ASSOCIATED MAIL REJECTION NOTICES

On September 1, 2017, the DOC received a public records request from Bacolod that sought:

> 1. Any and all emails that were composed, sent or received by any WA state DOC offender, or any outside party, via the WA State DOC JPay system, that were rejected due to sexually explicit content, during the time period of January 1, 2010, to the present date of this request.
>
> 2. Any and all mail rejection or mail restriction notices that were composed or issued as a result of composing, receiving, or sending, E-mail messages containing sexually explicit content, via the WA State JPay system, during the time periods of January 1, 2010, to the present date of this request.

CP at 161. This records request was assigned DOC tracking number PRU-49030 and was assigned to Public Records Unit Specialist Cary Nagel.

---

[3] Inmates in DOC custody are able to purchase a tablet-like device to listen to music, type messages, and play games.

Inmates are permitted to send and receive JPay messages through a kiosk or a tablet-like device. JPay messages that are sent by or to an inmate in the DOC's custody are screened by DOC mailroom staff pursuant to its mail policy. Some messages are automatically flagged by the JPay system for further review by the mailroom staff. If a DOC employee determines that a message should be restricted, the staff member will select an option in JPay to reject the message. The staff selects an option from a dropdown menu that identifies the reason for the rejection and submits the rejection. Once the rejection is submitted, the JPay system automatically generates a restriction notice and it is sent to the offender. The DOC also has an appeal process for restricted JPays.

On September 9, 2017, the DOC sent a letter to Bacolod acknowledging his records request and that the request had been assigned tracking number PRU-49030. In this letter, the DOC informed Bacolod that the requested records from the JPay system were not public records, created, used, or maintained by the DOC and, therefore, were not disclosable under the PRA. Bacolod did not follow up with this records request or otherwise seek clarification of this response.

Regarding records request PRU-49030, the superior court found that:

15. At the time of the request, the [DOC] did not have the ability to search for JPay messages based on the reason that a message was rejected, nor does it have such a capability today. Mr. Bacolod's request essentially sought every single message that was rejected as sexually explicit as well as the corresponding rejection notice for the entire time that JPay has existed in the [DOC]. This request would have required the [DOC] to review every single JPay user's account to see if JPays had been rejected and then determine the reason that the JPay was rejected;

16. Due to the sweeping and vague nature of Mr. Bacolod's request, this process would have been incredibly burdensome and almost impossible for the [DOC] to complete in a reasonable fashion. The request would have required the [DOC] to essentially research the reason for each rejection to determine if it was responsive;
17. Mr. Bacolod's incredibly broad, sweeping request lacked sufficient specificity to be a request for identifiable public records.

CP at 396. Bacolod does not assign error to these factual findings.

### III. PROCEDURE

Approximately eleven months after Bacolod received the DOC's final responses to PRU-49030 and PRU-47690, Bacolod filed this lawsuit in August 2018. The DOC filed a counterclaim requesting an injunction against Bacolod under RCW 42.56.565(2). The DOC's injunction was based on the nature of Bacolod's requests, which sought a large volume of sexually explicit information sent by and to inmates, as well as information about an album supposedly called "Isis Makes a Porn." The only explanation given by Bacolod for wanting to see these records is a conclusory assertion that he purportedly wanted to demonstrate that DOC was arbitrarily censoring the mail under the guise of information being sexually explicit. Notably, DOC had previously obtained a permanent injunction under RCW 42.56.565(2) when this same explanation was given by a group of Stafford Creek Corrections Center inmates who submitted 1,400 requests in 2015 and 2016 for JPay records. Additionally, Bacolod's explanation is undermined by his statements to a former inmate that appear to describe his JPay records requests as "golden." CP at 537.

After a PRA scheduling conference, the superior court concluded that it would wait to decide the DOC's counterclaim until after it had resolved Bacolod's PRA claims. It entered a scheduling order to that effect.

In January 2019, the superior court held a merits hearing based on the declarations and affidavits submitted to the court. The superior court concluded that the DOC did not violate the PRA and dismissed Bacolod's claims. The superior court concluded that (1) the DOC was not required to facilitate personal inspection by Bacolod in response to his request for all electronic records regarding himself, (2) the DOC did not violate the PRA in response to his request for all

inmates who downloaded "Isis Makes a Porn" because the requested records were not public records and the DOC did not have any records with that information, and (3) the DOC did not violate the PRA in response to his request for the sexually explicit JPay messages and rejection notices because the JPay messages themselves were not public records and Bacolod's request was not a request for identifiable public records.

The superior court's dismissal of Bacolod's claims effectively rendered the DOC's counterclaim moot. The superior court entered a written order that reflected its ruling on March 22, 2019. The superior court had previously denied a motion for reconsideration filed by Bacolod before the written order had been entered.

The DOC filed a cost bill seeking costs related to Bacolod's deposition, a filing fee, and statutory attorney's fees. Bacolod did not file any written objections to this cost bill. However, the cost bill was never reduced to judgment by the clerk of the superior court.

Bacolod appeals the superior court's decision dismissing his PRA claims.

ANALYSIS

Bacolod claims that the DOC violated the PRA when it (1) did not allow him to personally inspect electronic documents he requested, (2) failed to conduct a reasonable search for a list of any and all offenders who have downloaded any individual song or the entire album titled, "Isis Makes a Porn," from the JPay system, during the time period of January 1, 2010, to the date of his records request, and (3) failed to disclose or produce records in response to his request for sexually explicit JPay messages between inmates and their family and friends. Bacolod also takes issue with the DOC's cost bill for the first time on appeal. The DOC argues that it did not violate the PRA because (1) it provided Bacolod with physical copies of the documents he wanted to review

electronically, (2) it is not obligated to provide records that do not exist, and (3) Bacolod's request for sexually explicit JPay messages did not seek identifiable public records. Regarding its cost bill, the DOC argues that Bacolod has waived any objection because he did not object below or file a motion to reconsider the costs.

## I. STANDARD OF REVIEW

We review challenges to agency actions under the PRA de novo. *City of Federal Way v. Koenig*, 167 Wn.2d 341, 344, 217 P.3d 1172 (2009). We stand in the same position as the superior courts when the record on a show cause motion consists only of affidavits, memoranda of law, and other documentary evidence. *Mitchell v. Dep't of Corr.*, 164 Wn. App. 597, 602, 277 P.3d 670 (2011). However, unchallenged factual findings are treated as verities on appeal. *Adams v. Dep't of Corr.*, 189 Wn. App. 925, 939, 361 P.3d 749 (2015).

## II. ELECTRONIC INSPECTION OF RECORDS

Bacolod claims that the DOC violated the PRA because it only provided him with physical copies of his central file and health care records. Bacolod claims that he is entitled to personally view the electronic version of these documents at his prison. We disagree and hold that the DOC did not violate the PRA when it provided Bacolod with physical copies of documents responsive to his records request.

### A. THE DOC'S POLICIES ARE REASONABLE UNDER THE PRA

The PRA allows agencies to adopt and enforce reasonable rules that are consistent with the PRA's purposes of allowing access to public records, protecting public records from damage or disorganization, and preventing excessive interference with other essential functions of the agency. RCW 42.56.100. "Agency facilities shall be made available to any person for the copying of

11

public records except when and to the extent that this would unreasonably disrupt the operations of the agency." RCW 42.56.080(2).

The DOC has enacted regulations and an internal policy that govern the handling of public records requests that are consistent with the PRA's statutory provisions and ensure that the processing of PRA requests does not interfere with important agency functions. WAC 138-08-090(1). By the nature of their incarceration, inmates are not able to inspect records at the DOC's main office in Tumwater, Washington. Additionally, a requirement to transport inmates to Tumwater to inspect public records would interfere with the DOC's function of supervising inmates in a prison setting and could present a significant safety risk to the community. As Denise Vaugn, Allan Soper, and Israel Gonzalez explained in their declarations, an option that requires the DOC to permit inspection at a prison of records either on CD or via the state government network presents significant logistical and security concerns.

This court has previously held that the DOC's policies are reasonable procedures under RCW 42.56.100. In *Sappenfield v. Department of Corrections*, 127 Wn. App. 83, P.3d 808 (2005), an inmate asked for documents that were not contained in his central file. The DOC offered to mail the records after receiving payment for copy costs and postage in advance. *Sappenfield*, 127

No. 53368-5-II

Wn. App. at 85. Rather than pay for the records, the inmate sued the DOC and challenged WAC 137-08-090.[4,5] *Sappenfield*, 127 Wn. App. at 87-88.

*Sappenfield* held that "[The DOC's] procedures appropriately balance public disclosure act mandates with its duty to manage prison inmates." 127 Wn. App. at 84. The court rejected the inmate's arguments that the inspection should be allowed because the documents were located in the same facility. *Sappenfield*, 127 Wn. App. at 86-88. The court determined that promptly mailing responsive records at a reasonable charge satisfied the DOC's obligation to set its own disclosure rules. *Sappenfield*, 127 Wn. App. at 89. The court went on to say that the DOC is "statutorily required to adopt procedures that protect the integrity of its records and also avoid

---

[4] WAC 137-08-090 states:

(1) All requests for the disclosure of a public record, other than requests by incarcerated individuals for inspection of their health record or central file must be submitted in writing directly to the Department of Corrections Public Records Officer at P.O. Box 41118, Olympia, WA 98504 or via email at publicdisclosureunit@doc1.wa.gov identifying the record(s) sought with reasonable certainty. The written request should include:

(a) The name of the person requesting the record and their contact information;
(b) The calendar date on which the request is made; and
(c) The records requested.

Incarcerated individuals under the authority of the department of corrections will submit requests to inspect their own health record, under chapter 70.02 RCW, or central file to the records manager at the facility in which they are currently incarcerated. For all other requests, incarcerated individuals must submit the request to the public records officer at the address listed in this subsection.

(2) A request received after business hours will be considered to have been received the following business day.

[5] After *Sappenfield* and *Gronquist v. Department of Corrections*, 159 Wn. App. 576, 247 P.3d 436 (2011), the legislature amended RCW 42.56.120 multiple times, including a number of significant amendments in 2017. However, the legislature has never acted to overrule or otherwise undermine our decisions in *Sappenfield* and *Gronquist*.

13

interference with [the DOC's] essential function to securely restrain criminal offenders." *Sappenfield*, 127 Wn. App. at 89. The court determined that the PRA "does not categorically preclude denying requests *for direct inspection* when necessary to preserve the records and its own essential functions." *Sappenfield*, 127 Wn. App. at 89.

In *Gronquist v. Department of Corrections*, 159 Wn. App. 576, 247 P.3d 436 (2011), we relied on *Sappenfeld* and held that the DOC appropriately balanced its responsibilities under the PRA with its duties to manage prison inmates. In *Gronquist*, two inmates challenged the DOC's policy regarding personal inspection of responsive records. 159 Wn. App. at 582. The inmates requested to inspect records outside of their central files. *Gronquist*, 159 Wn. App. at 582. The DOC offered to mail the records to the inmates after receiving payment for copy costs and postage in advance. *Gronquist*, 159 Wn. App. at 582. The inmates argued that the PRA required the DOC to permit inspection of records and that denial of such inspection was a denial of the PRA request. *Gronquist*, 159 Wn. App. at 582.

Relying on *Sappenfield*, we determined that the DOC's policy reasonably considered the unique nature presented by requests from incarcerated individuals and the DOC did not deny the inmates responsive records by applying the DOC's valid policy. *Gronquist*, 159 Wn. App. at 586. In *Gronquist,* we noted that "there is no requirement [in the PRA] that an agency transmit the records to the requester who is unable to come to the agency's premises." *Gronquist*, 159 Wn. App. at 586 n.7.

Additionally, we previously held in *Mitchell v. Department of Corrections*, 164 Wn. App. 597, 277 P.3d 670 (2011) that the DOC does not have a duty to produce responsive records electronically to an incarcerated requester. We affirmed that the DOC's offer to provide the inmate

with copies to allow a third party to inspect the responsive records complied with the DOC's PRA obligations. *Mitchell*, 164 Wn. App. at 607.

These cases squarely govern and foreclose Bacolod's PRA claim. In response to Bacolod's request, Bacolod had the following options: to have a third party inspect the records at the DOC's headquarters, to pay for paper copies, to have the records emailed to a third party, or to purchase records on a CD that would be mailed to a third party. Bacolod, however, was not permitted—and the DOC was not required to provide—personal electronic inspection of records at Bacolod's prison. Bacolod made it clear that he only wanted to inspect the records at his prison.

Because the DOC's rules regarding inspection of records by inmates are reasonable and an agency has no obligation to permit inspection at the requester's location, the DOC did not deny Bacolod's records request when it declined to allow personal inspection but provided Bacolod a number of alternative options to receive the records in PRU-47690. Therefore, we hold that the superior court correctly rejected Bacolod's claim because the DOC responded to his records request according to its reasonable procedural rules adopted under RCW 42.56.100.

B. *SAPPENFIELD* AND *GRONQUIST*

Bacolod attempts to distinguish *Sappenfield* and *Gronquist* because "in both cases the prisoners requested to inspect records that did not pertain to themselves or what would otherwise be in their own central file or health care records." Br. of Appellant at 17. Bacolod is incorrect.

In *Gronquist*, one of the plaintiffs "sought inspection of 14 different categories of information, *including written materials regarding himself*, materials concerning a job that Gronquist appears to have wanted, the complete employment files of two corrections officers, and records and/or training materials that appraise staff." *Gronquist*, 159 Wn. App. at 581 (emphasis

added). Despite the fact that the records being requested consisted of materials about himself, we rejected Gronquist's claim. *Gronquist*, 159 Wn. App. at 591. In *Gronquist*, the important fact was that the records did not exist in the inmate's central file. *Gronquist*, 159 Wn. App. at 591. Similarly, based on the unchallenged factual findings, the records Bacolod requested did not exist in his central file or medical file. Thus, he was not permitted to inspect them.

Bacolod also challenges the applicability of *Gronquist* and *Sappenfield* by arguing that the term "central file" also includes electronic documents. This argument ignores the superior court's uncontested factual findings and the evidence presented by the DOC. Specifically, Denise Vaugn's declaration explains that "'central file' is a term that is used "to refer to a physical file of documents with records related to an offender's incarceration." CP at 106-07. The superior court correctly found that the requested records were not in Bacolod's central file.

Contrary to Bacolod's claim that the DOC created this definition for this litigation, this definition is consistent with how the term "central file" has been used in past litigation. *See Adams v. Dep't of Corr.*, 189 Wn. App. 925, 930, 361 P.3d 749 (2015) (describing physical file from which documents were removed). Additionally, it is consistent with Bacolod's own definition: "[A] [c]entral file is just hard copy records that are tangible, like these papers in front of us. I've never been able to see anything electronic regarding my central file." CP at 481. The term "central file" does not encompass documents in electronic databases.

Finally, Bacolod argues that the DOC violated the PRA because it failed to cite any exemption when it denied him the right to inspect electronic records and because it distinguished among requesters. The DOC was not required to cite any exemption when it denied him the right to inspect because the DOC was not claiming any exemption. Instead, the DOC was making the

records available to Bacolod, just not in the manner that Bacolod desired. We rejected a similar argument in *Gronquist*. 159 Wn. App. at 583 n.6. Similarly, the prior decisions foreclose Bacolod's argument that the DOC's polices impermissibly distinguish among requesters. Rather, as *Gronquist* and *Sappenfield* confirm, the policies regarding inspection by inmates are reasonable and based on the unique concerns presented by inspection by inmates. Furthermore, Bacolod has not pointed to any evidence that the DOC permits inspection by non-incarcerated requesters at a location of the requester's choosing. As such, Bacolod has not presented any evidence that the DOC is treating him different from other requesters. Therefore, Bacolod has failed to show that his circumstances are distinguishable from the issues decided in *Sappenfield* and *Gronquist*.

C. CONCLUSION

Because the DOC did not have a duty under the PRA to permit electronic inspection at Bacolod's prison facility, we hold that the superior court correctly dismissed his PRA claim.

### III. "ISIS MAKES A PORN" RECORDS

Bacolod also argues that the DOC violated the PRA when it failed to conduct a reasonable search for "[a] list of any and all offender[s] who have downloaded any individual songs or the entire album titled, 'Isis Makes a Porn,' by Stephanie Love, from the WA State JPay System, during the time period of January 1, 2010, to the present date of this request." Br. of Appellant at 26-27. The DOC argues that it is not obligated to provide records that do not exist or that are maintained by a third party vendor, and which records DOC did not prepare, own, use or retain, nor did the records impact DOC functions or decisions. We agree with the DOC.

An agency has no duty to produce a record that is nonexistent. *Bldg. Indus. Ass'n of Wash. v. McCarthy*, 152 Wn. App. 720, 734, 218 P.3d 196 (2009). Instead, agencies are required to

produce records that have been located after a reasonable search. *See Kozol v. Wash. State Dep't of Corr.*, 192 Wn. App. 1, 8, 366 P.3d 933 (2015).

Here, Bacolod requested a list of all inmates who downloaded songs from the album "Isis Makes a Porn" by Stephanie Love from the JPay system during the time period of January 1, 2010, to the date of his records request PLU-48397. Bacolod concedes that he was not aware of whether this album was ever available on JPay and admits that he could not find the album on JPay. The superior court found that the DOC did not have responsive records, and Bacolod does not assign error to that finding.

Because the records that Bacolod requested do not exist, we hold that the superior court correctly dismissed his claim.

IV. SEXUALLY EXPLICIT JPAY MESSAGES AND ASSOCIATED MAIL REJECTION NOTICES

Bacolod argues that the DOC violated the PRA when it failed to disclose or produce records in response to his records request PRU-49030 for all JPay messages that had been rejected as sexually explicit and their corresponding rejection notices. The DOC argues that the superior court correctly concluded that it did not violate the PRA in its handling of Bacolod's request because this request did not seek identifiable public records. We agree with the DOC.

Prior to determining whether the PRA applies, a court must make a threshold determination as to whether the requested documents are public records. *Dragonslayer, Inc. v. Gambling Comm'n*, 139 Wn. App. 433, 444, 161 P.3d 428 (2007), *overruled on other grounds by SEIU Local 925 v. Dept. of Early Learning*, 194 Wn.2d 546, 450 P.3d 1181 (2019). A valid request under the PRA must be for identifiable public records. *Hangartner v. City of Seattle*, 151 Wn.2d 439, 447-48, 90 P.3d 26 (2004). A party requesting records under the PRA "must, at a minimum . . . identify

18

the documents with reasonable clarity to allow the agency to locate them." *Hangartner*, 151 Wn.2d at 447. When a request does not seek identifiable public records, the agency is not obligated to respond to the request. *Hangartner*, 151 Wn.2d at 449.

The inability of an agency to perform a keyword search for records is one factor that courts consider in determining whether a request sought identifiable public records. *See Fisher Broadcasting-Seattle TV LLC v. City of Seattle,* 180 Wn.2d 515, 519-20, 326 P.3d 688 (2014). Agencies are not obligated to fulfill sweeping requests that would require the agencies to employ guesswork to fulfill or to serve as a requester's research assistants.

Under the unique circumstances of Bacolod's records request, the superior court's unchallenged findings of fact concluded that the DOC does not have the capability to search for JPay messages based on the reason that they were rejected. To fulfill the request, the DOC would be required to essentially research the reason for each rejection to determine if it was responsive. Because of the inability to search for the messages, the DOC would have to review every single JPay user's account to see if there were messages that had been rejected and the reason for the rejections. At the time of the proceedings below, there were 12,000 active JPay accounts in addition to the inactive accounts. The superior court noted that such a search would be incredibly burdensome and almost impossible for the DOC to complete in a reasonable fashion.

Additionally, as the superior court concluded that the actual JPay messages themselves are not public records that are subject to the PRA because they do not contain information relating to the conduct of government and are also not prepared, owned, used, or retained by any state or local agency. RCW 42.56.010(3). The messages in question are communications between inmates and their family and friends. Although the JPay messages are writings, they do not contain information

19

related to the conduct of government because they contain messages between private individuals. Furthermore, these messages are not owned, used, retained, or prepared by the DOC. Such private communications do not relate to the conduct of government. Additional, no DOC staff are involved in preparing or retaining the messages. The messages are saved on servers that are owned by JPay, and the messages are not used by the DOC in a manner that would transform such private communications into a public record.

Bacolod does not analyze the elements of a public record as applied to the messages themselves in any meaningful manner. Such cursory analysis does not adequately address the issue and we do not consider inadequately briefed argument. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (argument unsupported by citation to the record or authority will not be considered).

Because the JPay messages are not public records, we hold that the superior court correctly dismissed Bacolod's claim.[6]

## V. THE DOC'S COST BILL

Bacolod argues that the PRA prevents agencies from being awarded costs in litigating PRA suits. The DOC argues that it sought costs related to the payment of a filing fee for its counterclaim, the pro rata amount of the portions of Bacolod's deposition transcript that were submitted to the superior court, and statutory attorney fees. The DOC claims that all of these fees

---

[6] Bacolod claims that the DOC retains JPay records in its databases. Bacolod does not cite to any portion of the record to support this argument. RAP 10.3(a)(6); *Cowiche Canyon Conservancy*, 118 Wn.2d 801 at 809. Accordingly, we decline to address it. Bacolod also claims that the DOC collects a commission for each email sent or received by a prisoner. The DOC does receive a commission, but it is deposited into the Offender Betterment Fund for activities and support for offenders. Bacolod does not explain how this commission changes the analysis.

are permitted under RCW 4.84.010 and RCW 4.84.060. The DOC further argues that Bacolod has waived any objection to these costs because he did not object or file a motion to reconsider the costs. We agree with the DOC.

RCW 4.84.060 provides that a defendant is entitled to a judgment for costs "[i]n all cases where costs and disbursements are not allowed to the plaintiff." Such costs include filing fees, the reasonable expense of deposition transcripts, and statutory attorney's fees. RCW 4.84.010(1), (6), (7). A party objecting to a cost bill must generally file a motion to retax costs within six days of the filing of a cost bill. CR 78(e). Although the failure to file a timely motion to retax costs does not deprive a court of jurisdiction to review costs, we do not generally decide issues related to costs when the superior court has never been given the opportunity to address the issue. *See Mitchell v. Inst. of Pub. Policy*, 153 Wn. App. 803, 823-24, 225 P.3d 280 (2009).

Here, the DOC sought costs related to the payment of a filing fee for its counterclaim, the pro rata amount of the portions of Bacolod's deposition transcript that were submitted to the superior court, and statutory attorney's fees. Bacolod did not object to the costs or file a motion to reconsider costs. Consequently, Bacolod has waived any objection to such costs.[7]

Because Bacolod did not object below or file a motion to reconsider the costs, we hold that Bacolod's argument fails.

---

[7] Even if Bacolod did not waive such objections, his objections are unsupported. It is true that the PRA's attorney's fees and costs provision in RCW 42.56.550(4) does not appear to provide for an award of costs to an agency. However, this does not mean that an agency cannot recover costs under another statutory provision. In this case, the DOC was entitled to costs under RCW 4.84.060 because Bacolod was not entitled to costs.

21

ATTORNEY FEES

Bacolod requests appellate attorney fees and costs. We deny this request.

A party that substantially prevails on an appeal is entitled to costs. RAP 14.2. Because the superior court's decision is affirmed, Bacolod is not entitled to costs because he did not substantially prevail on appeal. Further, Bacolod is not entitled to statutory attorney's fees because he is pro se. *Mitchell*, 164 Wn. App. at 608. Thus, we deny Bacolod's request for appellant fees and costs.

CONCLUSION

We hold that DOC did not violate the PRA, reject Bacolod's untimely challenge to DOC's cost bill, deny his request for appellant fees and costs, and affirm the superior court's dismissal of his PRA claims.

SUTTON, A.C.J.

We concur:

WORSWICK, J.

MELNICK, J.